**Carlos MUNIZ, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

No. 60 Civ. 1624.

United States District Court
S. D. New York.

Feb. 21, 1968.

Friedman, Friedman & Friedman, New York City, for plaintiff; Richard D. Friedman, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., Southern District of New York, for defendant; Martin P. Solomon, Joel Forkosch, Asst. U. S. Attys., of counsel.

## OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW

LEVET, District Judge.

The plaintiff, Carlos Muniz ("Muniz"), has sued the United States of America because of injuries by assaults by other inmates received by him on August 24, 1959 while an inmate at a Federal Correctional Institution at Danbury, Connecticut.

The action is based upon the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346(b), 2671–2680, and 18 U.S.C.A. § 4042. United States v. Muniz, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963), affirming Muniz v. United States of America, 305 F.2d 285 (2nd Cir. 1962).

This court directed that the issue of liability be tried first pursuant to Rule 42(b) of the Federal Rules of Civil Procedure and the case was tried before the court without a jury.

After hearing the testimony of the parties, examining the exhibits, the pleadings and the proposed findings of fact and conclusions of law submitted by counsel, this court makes the following

Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Some time in July 1959, plaintiff, who had been convicted and sentenced for mail theft, was transferred from Lexington, Kentucky, to the Danbury Correctional Institution, a federal institution, located at Danbury, Connecticut (38, 247).[1]

2. On August 24, 1959, plaintiff was an inmate of the United States Correctional Institution at Danbury, Connecticut.

3. The United States Federal Correctional Institution at Danbury Connecticut, is a medium custody, adult correctional institution (20, 108), which consists of two-story buildings surrounding a yard approximately 287 feet by 631 feet at the point of greatest length (156–157; Ex. 15). The institution is not surrounded by a wall or fence, but is self-enclosed (40, 128).

4. The two-story dormitory buildings are on the east side of the yard. The barber shop is at the south end. The kitchen, officers' mess hall and inmate mess hall are along the west side (156–157; Ex. 15).

5. The first floor dormitories along the west side of the compound are named, running from north to south, New Hampshire, Vermont, Massachusetts, Connecticut and Rhode Island. There are no dormitories over New Hampshire and Rhode Island houses. There are dormitories on the second floor above the other three dormitories which are named, running from north to south, Concord, Providence and Berkshire (157–158; Ex. 15).

6. The Danbury inmates in 1959 had an average age of about 30 years, were not persons with long sentences (generally not over five years as of the time of commitment), and had been committed largely for the less serious type of offenses. The primary goal of incarcera-

---

1. References relate to the official trial transcript (stenographer's minutes).

References preceded by "Ex." relate to trial exhibits.

tion at Danbury was rehabilitation (128, 129). Very few persons convicted of assault, burglary or homicide are present in federal prisons (131). Less than twenty-five of those in Danbury in 1959 were juvenile or youthful offenders who had had some difficulties elsewhere relating to their "peer" group type of competition and who were sent in small numbers to adult correctional institutions to be in a more stable environment (132–134).

7. At supper time, about 5:00 o'clock, on August 24, 1959, another inmate, Nelson Sosa, complained to Muniz that certain other inmates, including Cottrell and Thompson, were bothering him up at the glove factory. Muniz volunteered: "I'm going to tell them to leave you alone." (63–66, 70).

8. Muniz and Sosa left the dining room and entered the yard or compound. Sosa informed Muniz that Swann was trying to make a "sissy" or homosexual out of him (Ex. A). There Sosa pointed out a group of about eleven inmates, seated in front of Connecticut and Berkshire houses, as apparently the group to which he had previously referred (42–43). Among them were inmates Swann, Cottrell, Thompson, Brown and Cleveland (48–49). Muniz walked toward the group and thereupon told Swann to "lay off the kid," meaning Sosa (63–65; Ex. A). Swann, according to Muniz, hit him with a piece of pipe on the shoulder (51), or, if we take Muniz' written statement, on the arm with a mop handle (Ex. A). Bell, an inmate, hit Muniz on the head (Ex. A). Muniz hit Swann in the mouth with his fist (Ex. A).

9. Thereupon Sosa ran away, while Muniz ran to his dormitory, Concord House, pursued by some of the inmates (52, 53; Ex. A). There, certain of the inmates following Muniz hit him with mop sticks and threw a chair at him, hitting his left hand (53, 54, 73–74). Muniz mentioned his hand and shoulder as the parts hit while in the dormitory (75, 76). Muniz became unconscious, apparently from loss of blood from the blow received in the yard (74, 75, 76).

He was assisted and taken to the hospital where a craniotomy was performed on August 24, 1959; he remained hospitalized for nine months (153, 78).

10. At the time the affray began, there was two or three hundred inmates in the court yard, but there was only one guard in the yard (167). Officer Robert Karin was on guard duty in the upper dormitories, Concord, Providence and Berkshire Houses (242), Officer Mannion was on guard duty in the lower dormitories, Vermont, Massachusetts and Connecticut Houses (194, 252), and only Officer Robert Boyden was on guard duty in the yard (155, 157; Ex. 15).

11. Boyden, now a Connecticut State Trooper (153), was stationed at the southern end of the court yard between the Chaplain's office and the barber shop at the time of the affray (155, 157; see "X" on diagram, Ex. 15). He saw some inmates chasing an individual toward and enter Concord House (161). From the barber shop Boyden immediately telephoned the control room and ordered them "to clear the yard" (162). Before he hung up, the Klaxon started (188). Thereupon, Boyden saw a guard locking the Concord House door (172). Boyden locked the doors of Rhode Island, Berkshire and Connecticut Houses (173). Shortly after, Boyden found some inmates outside each dormitory and let them in (185).

12. At about 5:00 P.M. on August 24, 1959, Steven Noone, employed as a correctional officer at Danbury on that date (193) and a correctional supervisor at the present time, saw certain inmates running down the sidewalk in front of Berkshire (201); he dialed "emergency" (203) and then ran to Concord House (204). When he arrived at the Concord dormitory he saw a dormitory officer (Karin) coming down the stairs with a large group of men behind him (205). Of these men he remembered Swann, Thompson, Cleveland and Cottrell (207). Noone told Karin, "Come out and we'll lock the door" (208, 209). Officers Karin and Noone attempted to lock the door but a number of inmates hit the door, knock-

ing it open, and six or seven inmates came out before the door could be locked. The group got out, but not Swann (210). Within a minute after the door was locked four or five other guards had arrived (211) and Muniz was brought down by another inmate before Swann came down (213–214).

13. At approximately 5:00 P.M. on August 24, 1959, Officer Karin was in the officers' corridor giving out mail at Berkshire House when he heard yelling and screaming coming from Concord House. Karin ran down to Concord House and saw fighting in the dormitory from his position on the other side of the screen in the officers' corridor. Karin then opened the door from the officers' corridor to the recreation room, ran through the recreation room, down the staircase and attempted to lock the door (243–246). This staircase was the only exit from Concord House (246). As Officer Karin ran through the recreation room, the inmates who had chased Muniz into the Concord dormitory came running out and ran after Officer Karin down the staircase (244, 245).

14. I find that the instructions to inmates at Danbury in August 1959 were as follows: (1) not to fight; (2) not to run in the yard; (3) when the Klaxon sounds to go to the quarters (the dormitories) (230–231); and (4) by regulation, no inter-house visiting (i. e., no visits to other dormitories were permitted) (207–208).

15. In case of trouble in the yard, the instructions to the guards at Danbury in August 1959 were that the guard discovering it would call 222 and have the Klaxon rung to clear the yard (234) and then lock the doors (of the dormitories) to clear the area of any troublemakers and to put the people in where they belonged (235). In the Connecticut State Prison at Wethersfield in August 1959, similar instructions to guards were given by the Wethersfield warden with respect to inmates in a compound comparable to the Danbury compound (107, 96, 100, 101, 111, 114).

16. Two inmates concerned in the affray involving plaintiff, one Henre and one Bell, had each previously incurred forfeiture of good time for a homosexual act, but the record in neither case indicated whether the act was with consent or lack of consent. No other inmates involved had any record of offenses of serious nature; the reports as to Henre and Bell were limited to the foregoing (137, 138, 139). Nothing more indicating a history of serious misconduct in prison was shown to have made available to defendant's wardens or employees concerning the assaulting inmates. For instance the gist of Boyden's information from superiors about any of the inmates concerned was that Cleveland "wouldn't conform" and "wouldn't go along with any of the program" (179, 180–184). Defendant had no notice or knowledge of any fact requiring special precautions (Heaney, 3, 4, 124, 127, 128). There was no reason to anticipate any hazard such as that which developed.

17. The said instructions previously given to the guards at Danbury were faithfully executed on August 24, 1959, when the affray concerning plaintiff occurred. The plaintiff has failed to prove any negligence under the facts and circumstances of this case in either defendant's instructions or defendant's acts. The defendant acted as a reasonable man would act under all the facts and circumstances then present. No facts came to defendant's attention by actual or constructive notice requiring it to act otherwise than it did.

18. Under the facts of this case, it was reasonable for defendant to give and to carry into effect the instructions aforesaid. The plan and the acts pursuant thereto were reasonable. No information about probable or likely assaults upon plaintiff, such as appear to have occurred, was brought to defendant's attention. No constructive notice thereof has been demonstrated.

19. A prison or correctional institution such as Danbury was in 1959 could not reasonably be expected to guard each inmate against the remote possibility of

attacks by another inmate or group of inmates. The care provided was reasonable. The defendant is not an insurer of plaintiff's safety.

## DISCUSSION

The primary issue for determination here is not whether the inmates assaulted plaintiff or whether plaintiff provoked the assault, but whether defendant is liable to plaintiff for the injuries he suffered at the hands of the other inmates, and on this issue the first question to be decided is whether defendant was negligent.

## I.

## DUTY OF DEFENDANT

■ "The duty of care owed by the Bureau of Prisons to federal prisoners is fixed by 18 U.S.C. § 4042, independent of an inconsistent state rule." United States v. Muniz, 374 U.S. 150, 164, 83 S.Ct. 1850, 1859, 10 L.Ed.2d 805 (1963). Title 18 U.S.C. § 4042 provides in part that the Bureau of Prisons under the direction of the Attorney General, shall " * * * (3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States."

■■ The applicable law as to liability in this instance is the law of the State of Connecticut. 16 U.S.C. § 457; United States v. Muniz, 374 U.S. at 165, note 27, 83 S.Ct. 1850, 10 L.Ed.2d 805; Stokes v. Adair, 265 F.2d 662 (4th Cir.), cert. denied, 361 U.S. 816, 80 S.Ct. 56, 4 L.Ed.2d 62 (1959); Fleishour v. United States, 244 F.Supp. 762 (N.D.Ill. 1965), aff'd, 365 F.2d 126 (7th Cir.), cert. denied, 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1966). I find that Connecticut has no statutory provisions applicable to this type of case and I find no decisions of the courts of Connecticut directly relating to the specific issues involved. Under Connecticut law, the plaintiff generally, to recover for negligence, must prove (1) that the defendant failed to use due care, Beckwith v. Town of Stratford, 129 Conn. 506, 29 A. 2d 775 (1942), and (2) that the conduct complained of was the proximate cause of the injury, Nehring v. Connecticut Co., 86 Conn. 109, 84 A. 301, 304, 524, 45 L.R.A.,N.S., 896, 902 (1912).

■ The liability of the United States is dependent upon "whether a private individual under like circumstances would be liable under state law." United States v. Muniz, 374 U.S. at 153, 83 S.Ct. 1850, at 1852, 10 L.Ed.2d 805. The significant question then becomes: "Did the agents of the United States act or fail to act as reasonable persons would under all the circumstances?" Fleishour v. United States, 244 F.Supp. at 767.

The applicable general principles of the Federal Tort Claims Act have been expressed as follows:

" * * * The Federal Tort Claims Act limited the liability of the United States to the same extent and in the same manner as that of a private individual in similar circumstances. 28 U.S.C. § 2674. * * *

"In summation, it follows that the appellant cannot recover against the United States: (a) for absolute liability without fault; (b) for novel and unprecedented causes of action; (c) for breaches of duty which are not held actionable under the law of the state where the injury occurred; (d) for acts or omissions of governmental employees who could not be held liable individually; * * *."

Goodwill Industries of El Paso v. United States, 218 F.2d 270, 272 (5th Cir. 1954).

■ In the discharge of the government's duty to prison inmates, it must "exercise ordinary care in (1) the classification of prisoners and in (2) the custody of prisoners properly classified." Cohen v. United States, 252 F.Supp. 679, 688 (N.D.Ga.1966). In that case, Smith, J., wrote:

"Thus, upon admission of an inmate, a reasonable assignment to a proper custody category, i. e. minimum, medium, maximum, etc. must be made on the basis of prior record and mental and psychiatric reports on the prisoner. This is a continuing duty and pos-

sible reclassification may result from behavior, further testing, and observation during the course of confinement. * * * " (p. 688)

Judge Smith then continued:

"Once a classification is made, then the government has the duty to take reasonable care in the maintenance of his custody. While the standard of ordinary care remains the same, obviously more supervision is needed for a person in close custody, than one in minimum or 'trusty' status. The greater the need for close confinement then the more is required in preserving that status." (p. 688)

" * * * By no means is the government an insuror of the safety of a prisoner. This is not the philosophy of the Federal Tort Claims Act, and the government has the same status as any private party in such matters. Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48." (p. 688)

"The Federal Tort Claims Act was not intended to create liability without fault. Dalehite v. United States (1953) 346 U.S. 15, 44–45, 73 S.Ct. 956, 97 L.Ed. 1427, reh. den. 346 U.S. 841, 74 S.Ct. 13, 98 L.Ed. 362, reh. den. 346 U.S. 880, 74 S.Ct. 117, 98 L.Ed. 386, reh. den. 347 U.S. 924, 74 S.Ct. 511, 98 L.Ed. 1078. By its express terms, it can only be invoked for a 'negligent act or omission'. Negligence presupposes a breach of duty owed the injured party. As the Court said in South Carolina Electric & Gas Co. v. Utilities Const. Co. (1964) 244 S.C. 79, 88, 135 S.E.2d 613, 617, 'Breach of legal duty is essential to negligence'. Absent a 'failure to perform some duty owed' the injured party, there can be no negligence. * * "

Rogers v. United States, 267 F.Supp. 25, 28 (D.S.C.1967).

■ Designation of places of confinement of federal prisoners and the transfer of those convicted of an offense against the United States is by statute conferred upon the Attorney General.

Title 18 U.S.C. § 4082; Kohler v. Nicholson, 117 F.2d 344 (4th Cir. 1941); Stroud v. Johnston, 139 F.2d 171 (9th Cir. 1943), cert. denied, 321 U.S. 796, 64 S.Ct. 846, 88 L.Ed. 1085; Stillwell v. Looney, 207 F.2d 359 (10th Cir. 1953); Lawrence v. Willingham, 373 F. 2d 731 (10th Cir. 1967). In this respect the warden has a broad discretion in classifying prisoners. 18 U.S.C. § 4042; Johnson v. United States, 258 F.Supp. 372 (E.D.Va.1966).

■ The common law imposes upon a sheriff (or warden) the duty to exercise reasonable care and diligence to protect the prisoner from danger, known to or which might reasonably be apprehended by him. A warden is not liable in the absence of a showing that he had reason to anticipate violence and failed to prevent it. Generally, in order to hold a sheriff or jailer liable for assault by one prisoner of another, the sheriff or jailer must have actual knowledge of the dangerous character of the prisoner committing the assault. The sheriff is not a guarantor of safety of the prisoner. Justice v. Rose, 146 N.E.2d 162 (Ohio Com.Pl.1956), aff'd, 102 Ohio App. 482, 144 N.E.2d 303 (1957). See also Taylor v. Slaughter, 171 Okl. 152, 42 P.2d 235 (Okl.1935).

The court in Johnson v. United States, 258 F.Supp. at 376, stated:

" * * * The fact that he [i. e., plaintiff] had a reputation as a homosexual and had been charged with previous sexual assaults in other institutions is not enough to require that he be taken out of the general population and kept locked in a cell. * * "

No authority has been discovered requiring a warden to isolate inmates solely because of their homosexual inclinations in order to protect other inmates or from fear of such unanticipated acts as occurred here, including the assaultive proclivities or acts of the other inmates.

## II.

### WAS DEFENDANT NEGLIGENT?

There was no evidence that the records of the eleven inmates concerned, except

for the two with records of overt homosexuality, were unusual or presented any probable hazards to their fellow-inmates. Hence, there was no more than the calculated risk inherent in prison life. In Fleishour v. United States, 244 F.Supp. 762 (N.D.Ill.1965), aff'd, 365 F.2d 126 (7th Cir.), cert. denied, 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1966), Judge Will stated:

" * * * all aspects of prison life which seek to encourage rehabilitation and responsible conduct by prisoners inevitably involve calculated risks. Most of those incarcerated have greater or lesser assaultive tendencies and the only certain way to insure against prison episodes is by complete isolation which is not only physically very difficult, if not impossible, but also least likely to induce positive attitudes in and the rehabilitation of persons so treated.

"Accordingly, it is, we are told, standard practice in modern penal institutions to take calculated risks in various aspects of prison life, housing, work, recreation, religious worship and others, so that prisoners may learn to get along with other persons as part of the rehabilitation process. * * * " (244 F.Supp. at 767)

█ The decision of the Danbury warden as to the number and placement of guards is not a matter on which this court is empowered to substitute its judgment. United States v. Muniz, 374 U.S. at 161, n. 19, 83 S.Ct. 1850, 10 L. Ed.2d 805.

No one of the inmates had been classified as psychotic, psychopathic or paranoid; none had been segregated. The officials were not on notice of any one possessing a dangerous assaultive or psychological history, unlike the facts in Cohen v. United States, supra, which appears to be the only case in which a prisoner had successfully sued the United States under the Federal Tort Claims Act.

█ The instructions promulgated and practice followed by the guards were

reasonable under all the circumstances. Muniz was detained in the dormitory for only a very limited time.

The claim of this plaintiff has no likeness to illustrative cases in which inmates have succeeded in state courts, such as the following:

In Lamb v. Clark, 282 Ky. 167, 138 S.W.2d 350 (1940), the jailer was held liable for failing to protect a prisoner who was beaten by members of a prisoners' "kangaroo" court, which, in the exercise of reasonable care, defendants could have reasonably anticipated.

In Dunn v. Swanson, 217 N.C. 279, 7 S.E.2d 563 (1940), a sheriff was held liable for the death of a prisoner who was negligently placed in a cell with a violently insane man who during the night killed the prisoner by beating him with a leg torn from a table which had been left in the cell by the sheriff and jailer. Similiter, Kusah v. McCorkle, 100 Wash. 318, 170 P. 1023, L.R.A.1918C, 1158 (1918).

In Honeycutt v. Bass, 187 So. 848 (La.Cir.Ct.App.1939), a town marshal was held negligent to an inmate injured by a belligerently intoxicated prisoner placed in an unlocked cell.

In Browning v. Graves, 152 S.W. 2d 515 (Tex.Ct.Civ.App.1941), a sheriff was held liable for the death of an inmate killed by inmates' "kangaroo" court where there were several blackjacks in jail and decedent was killed by a blackjack and where ordinary care would have revealed presence of blackjacks. The officer knew such weapons had been found among those prisoners every time he had made searches. The court wrote:

" * * * If a jailer whose duty it was to care for and protect his prisoners from harm, would have, in the exercise of ordinary care, discovered the presence of these weapons and removed them, and thus prevent the tragedy that resulted in Graves' death, he, with his principal, the sheriff, would be responsible in

damages for having failed. * * " (p. 519)

On the other hand, in Gunther v. Johnson, 36 App.Div. 437, 55 N.Y.S. 869 (2d Dept. 1899) the court wrote:

" * * * The principle upon which we decide this appeal is that the sheriff was not bound to anticipate such an affray between the parties. Williams was confined as a vagrant, and not for any crime indicating violence of disposition or qualities which rendered his presence dangerous to other prisoners. * * * " (p. 440, 55 N.Y.S. p. 871)

" * * * The difficulty is that there is no evidence that the sheriff knew of any trouble in the jail, or was bound to anticipate the attack of Plag upon Williams, or the subsequent felonious assault of Williams upon Plag. He cannot be charged with negligence in failing to prevent what he could not reasonably anticipate, and consequently it cannot be affirmed that the sheriff failed in his duty, or that he willfully did something which resulted in the injury to the plaintiff's intestate." (pp. 442–443, 55 N.Y.S. p. 873)

In Riggs v. German, 81 Wash. 128, 142 P. 479 (1914), the opinion states:

" * * * The defendant is protected by a presumption that he has in all things performed his official duties, not the least of which is the exercise of reasonable and ordinary care to protect a prisoner while in his custody. McPhee v. United States Fid., etc., Co., 52 Wash. 154, 100 P. 174, 21 L.R.A.,N.S., 535, 132 Am.St.Rep. 958; 25 Am. & Eng.Encl. of Law, 671. Or, as has been held, a sheriff cannot be charged with neglect in failing to prevent what he could not reasonably anticipate. Gunther v. Johnson, 36 App.Div. 437, 55 N.Y. 869.

" * * * *

"A sheriff should not be required, in the exercise of ordinary care, to maintain himself or a deputy in the presence and company of his prisoners, unless the circumstances, as developed by the testimony, are such that it can be said that the sheriff had reasonable ground to apprehend the danger. * * * " (142 P. at 480)

Plaintiffs have been denied compensation in the following instances in the federal courts: Fleishour v. United States, supra; Johnson v. United States, supra; Rogers v. United States, supra.

In view of the above determination that defendant acted with reasonable care (Findings 17–19) and, hence, was not negligent, it is unnecessary either to consider a defense of contributory negligence or to make findings of fact thereon.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and over the subject matter of the action under 28 U.S.C. § 1346(b).

2. The law of Connecticut, governs this action. Williams v. United States, 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761 (1957).

3. The Federal Tort Claims Act provides that the United States shall be liable, except where the Act makes specific exceptions, in the same manner and to the same extent as a private individual under like circumstances. 28 U.S.C. § 2674.

4. The discretionary exception to the Federal Tort Claims Act bars any recovery predicated on the classification or transfer of prisoners and the number of and deployment of guards at the Federal Correctional Institution at Danbury. 28 U.S.C. § 2680(a).

5. The instructions to the guards by the warden were reasonable and the officials charged with the maintenance of the Federal Correctional Institution carried out their duties with reasonable care under all the circumstances. The defendant was not negligent as to plaintiff and, hence, is not liable to plaintiff for his injuries.

6. The United States is not liable for the injuries plaintiff sustained and the complaint should be dismissed with costs.

Submit judgment on notice.