118 N.J. Super. 384 (1972)
288 A.2d 36
FRANK W. HARRIS, PLAINTIFF-APPELLANT,
v.
STATE OF NEW JERSEY; WARREN PINTO, SUPERINTENDENT OF THE NEW JERSEY STATE PRISON AT RAHWAY, NEW JERSEY; THOMAS OLDEN AND JOHN RAFFERTY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted November 1, 1971.
Decided March 1, 1972.
*386 Before Judges CONFORD, MATTHEWS and FRITZ.
Messrs. Edelstein & Edelstein, attorneys for appellant (Mr. Benjamin Edelstein, on the brief).
Mr. George F. Kugler, Jr., Attorney General of New Jersey, attorney for respondents (Mr. Stephen Skillman, Assistant Attorney General, of counsel; Mr. Daly D.E. Temchine, Deputy Attorney General on the brief).
*387 The opinion of the court was delivered by FRITZ, J.A.D.
Plaintiff was a prisoner confined in maximum security detention at Rahway State Prison when he was assaulted in his cell by a fellow prisoner and badly injured. He sues the State of New Jersey and the individual defendants on the theory that they were negligent in their respective duties to prevent others from injuring him and in their failure to exercise the required care in "the hiring and supervision of proper and competent help" proximately resulting, he claims, in these injuries. Defendant Pinto is the superintendent, Olden the deputy keeper, and Rafferty the wing keeper of the prison wing involved. Summary judgment in favor of defendants was entered on motion before trial, and plaintiff appeals.
All parties were deposed and certain other documentary evidence was available to the trial judge at the time of the motion. Giving plaintiff the benefit of the doubt with respect to the facts and allowing him all reasonable inferences, as we must for the purposes of a motion for summary judgment, we find the facts to be as follows.[1]
On the morning of April 6, 1967 plaintiff returned to his cell from mess. Another prisoner, who had previously solicited plaintiff's participation in sexual activities and was refused, had gained access to plaintiff's cell, was lying in wait, and with the use of a reamer apparently appropriated from the machine shop where the assailant worked, inflicted serious injuries upon plaintiff. While plaintiff and assailant were domiciled in the same wing, plaintiff's cell was on the fourth tier and the assailant's cell was on the second tier. Visiting between tiers is forbidden. An inmate may go to a location different from one at which he belongs only upon the issuance of a pass for a legitimate reason. In this respect, the following instructions are abstracted from the Manual *388 of Operations and Procedures promulgated by the Division of Correction and Parole of the Department of Institutions and Agencies for the New Jersey State Prison at Rahway.
Counts are a continuous process in a maximum security institution, and officers are expected to be aware of who and what groups are in their cells, and where they should be if out of their cells. This awareness should be with him at all times.

* * * * * * * *
Inmates are not to be permitted to visit from cell to cell, tier to tier, or wing to wing. If an inmate has a problem that makes it necessary for him to see or talk to another inmate, locking in a different location, and if, in the officer's opinion, his request warrants immediate attention, the officer will advise the Center Keeper. If the Center Keeper approves, both inmates will be brought together in the Center.
The rules are also illuminative with regard to the weapon which was used:
A record will be kept of all tools in the shop and the NAME and NUMBER of the inmates using a certain tool will be listed. The inmate will be held responsible for the tool issued to him until he returns same at the end of the working period  or whenever it is necessary for him to leave the shop. If a tool discrepancy is discovered, shop instructor or officer shall immediately contact the Shop Marshall. Tools will be issued ONLY to inmates who are approved to use such tools.

* * * * * * * *
Upon completion of the morning and afternoon work periods, after all tools have been checked in and found to be correct, the instructor or officer will answer the bell from the Center with one ring, signifying the return of the inmates to the housing units.
In addition to regulation by procedures set up to prevent the presence of inmates in cells or tiers in which they do not belong, deposition testimony of the individual defendants acknowledged a responsibility for the safety, care and custody of the inmates. Superintendent Pinto testified, for instance, that "escorts" shepherding the prisoners from place to place within the prison walls should be aware of where the prisoners' cells are, at least as far as the housing unit's escorts are concerned. The superintendent expressed the hope that the *389 keeper at the resident location would know the inmates, but added that he could not be certain of this "because we have new officers from time to time who naturally would not know the inmates, unfortunately." It would appear that Rafferty, responsible for the wing involved at the time of this incident, was a relief man and not there on permanent assignment. He knew plaintiff by sight. He did not know the assailant. He did not see the assailant go into plaintiff's cell.
Deputy keeper Olden testified to an assumption that "all of the inmates in a maximum security institution were somewhat emotionally disturbed or somewhat had a pension [sic; penchant] for, let's say, psychopathic activity." We observe in passing that the presence of homosexuality in the prisons of this country, more often than not with concomitant violence, is brought to our attention too often to be either ignored or disparaged.
There is no evidence suggesting that the assailant was particularly known to be of a violent nature, nor is there any evidence that defendants knew or had reason to know of the prior relationship, adverted to above, between plaintiff and the assailant.
At the outset we affirm the judgment in favor of the State of New Jersey on the ground of sovereign immunity. Abrogation of that doctrine in Willis v. Dept. of Conservation and Economic Development, 55 N.J. 534 (1970), was held to be not retroactive absent legislative fiat, and was conditioned by a moratory period to enable the Legislature to act. See N.J.S.A. 52:4A-1 as amended by L. 1971, c. 187.
Plaintiff argues that allowance of the Willis claim in a determination that rejects others similarly situated deprives him of the constitutionally safeguarded equal protection of the laws. The short answer to this contention is to be found in Willis where, at 55 N.J. 541, the court refuses retroactive application and rejects "other claims in being," but permits Willis to proceed "* * * for the practical reason that case law is not likely to keep up with the needs of society if the litigant who successfully champions a cause is left only *390 with that distinction." Incentive "to challenge existing practices or prior holdings which, in the public interest, ought to be reviewed," reasonably justifies disparity of treatment. Goldberg v. Traver, 52 N.J. 344, 347 (1968); cf. N.J. Chapter, Am. I. of P. v. N.J. State Bd. of Prof. Planners, 48 N.J. 581, 601 (1967), app. dism. 389 U.S. 8, 88 S.Ct. 70, 19 L.Ed.2d 8 (1967).
The individual defendants concede that they are not so insulated against tort claims and that they can be held liable for the negligent performance of their duties. Prior to Willis, supra, at least, this latter statement might not have been so clear as a general proposition of law relating to public servants, in light of such authority as Czyzewski v. Schwartz, 110 N.J. Super. 255 (App. Div. 1970). We accept defendants' concession on the basis that here, as in Kisielewski v. State, 68 N.J. Super. 258 (App. Div. 1961), cert. den. 36 N.J. 144 (1961), the charges of negligence are in any event in such broad terms as to frustrate a defense predicated upon the discretionary-ministerial dichotomy examined in Czyzewski, at least as a basis for summary judgment. As is pointed out in Jackson v. Muhlenberg Hospital, 53 N.J. 138 (1969), a maximum of caution is required in the grant of summary judgment where a ruling would reach far beyond the particular case.
While an absence of conclusions by the trial judge, beyond the statement that "There is no negligence of any kind shown insofar as they [the individual defendants] are concerned * * *," deprives us of knowing the basis for his holding, it would appear from his adoption of defendants' brief (with which we were not furnished) as "my opinion" that he was persuaded by the principal argument of defendants here to the effect that a jailer is not liable in the absence of a showing that he had reason to anticipate the particular violence which in fact occurred and failed to prevent it. Although defendants formulate the argument in terms of foreseeability  a criterion acceptable to us  they really urge the imposition of an actual notice doctrine.
*391 Although authority exists which appears to suggest this proposition, e.g., Muniz v. United States, 280 F. Supp. 542 (S.D.N.Y. 1968) (for a collection of the cases and various views see Annotation, "Liability of Prison Authorities for Injury to Prisoner Directly Caused by Assault by Other Prisoner," 41 A.L.R.3d 1021), we think that such an abridgement of ordinary negligence principles, requiring foreseeability of the precise altercation or at least a propensity in the particular assailant, is too confining. We do not disagree with the statement from Muniz v. United States, supra, 280 F. Supp. at 547, that "The common law imposes upon a sheriff (or warden) the duty to exercise reasonable care and diligence to protect the prisoner from danger, known to or which might reasonably be apprehended by him." Our disagreement with Muniz arises from our conviction that in the present climate of prison unrest and inherent sociological problems, including the now recognized psychological difficulties produced by the unavailability of ordinary sexual activity, the potential for violence ought to be anticipated as a not unusual thing without the requirement of the demonstration of any particular propensity in any particular prisoner. The record in this case illustrates the soundness of this philosophy in the testimony of the deputy keeper, who volunteered an assumption (by which, as he said, "we must work") that all inmates in a maximum security institution were somewhat emotionally disturbed or had a penchant for psychopathic activity.
We do not mean to be understood to say that extraordinary foresight or exceptional preventive means must be employed to escape liability. Much less do we suggest strict liability. We do hold that it is unnecessary for a plaintiff, situated as is plaintiff here, to demonstrate a known propensity for violence in another prisoner in order to recover. The duty of care thus imposed upon the jailer is simply the duty of care ordinarily formulated in negligence questions: a duty to employ the care of a reasonable and prudent person in the protection of prisoners against reasonably foreseeable *392 risks generally. Such risks may well include the possibility of an eruption of the inherent potential for violence said by the deputy keeper in this case, implicitly at least, to be present in every prison in the maximum security situation. We repeat for purposes of emphasis that our recognition of prison problems is not intended nor should it be deemed to impose any greater duty upon prison keepers than that of reasonableness as that word is defined in conventional negligence law.
Ordinarily a determination of the issues thereby presented will be one for a jury. In the instant case, where the rules and regulations of the prison provided for procedures to prevent the appropriation of incipient weapons from the tool shop and where the superintendent testified to the desirability that the "man at the location" know the inmates within his domain, we have no doubt that fact questions were presented requiring jury determination, despite the lack of disagreement as to the events themselves.
As against an anticipated suggestion that such a rule might "open the flood gates," we observe that if the incidence of prisoner injury is so great factually as to undergird that fear, this is another reason for a tightening up of the standard of care required by those who supervise our prisons.
Defendant's contention, appearing on the coattails of their principal argument, that plaintiff should be barred, in any event, by his own contributory negligence, by virtue of his failing to inform the prison authorities of difficulties he was having with his assailant or even seeking assistance within the inmate population, is of no avail here. Such asserted contributory negligence obviously presents questions of fact which are also for a jury's determination.
Accordingly, we must reverse the court below and remand for a plenary trial as to the individual defendants. Although probably unnecessary, we note that defendants may, of course, contest at trial any factual conclusion which for the purposes of this appeal from the grant of summary *393 judgment on motion we were obliged to assume to be true.
Reversed and remanded.
NOTES
[1] The fact finding task has been imposed upon us by the failure of the trial judge to make any findings of fact. See R. 1:7-4, made applicable by R. 4:46-2.