608 A.2d 263

EDDIE CHATMAN AND SARAH CHATMAN, HIS WIFE, PLAIN-TIFFS-APPELLANTS, v. PAUL HALL, VALERIE HALL, JOHN DOE(S) F-Z MAINTENANCE PERSONNEL AND/OR ADMINIS-TRATORS, (BEING FICTITIOUS NAMES) AS CONSTRUCTION COMPANY/COMPANIES INDIVIDUALLY, JOINTLY, SEVER-ALLY AND/OR IN THE ALTERNATIVE, DEFENDANTS, AND WALTER RICHARDSON, WALTER RAY, CLARENCE MILLER, JOSEPH DIFANTE, WILBERT FOUNTAIN, AND ALBERT BENJAMIN, DEFENDANTS-RESPONDENTS.

Argued November 4, 1991—Decided June 29, 1992.

*Stephen W. Guice* argued the cause for appellants (*Friedman, Bafundo, Ginsberg and Porter,* attorneys).

*Donald Caruthers, III,* argued the cause for respondent Walter Richardson (*Yampell, Nicodemo & Caruthers,* attorneys).

*Arthur E. Donnelly III,* argued the cause for respondents Walter Ray, Clarence Miller, Joseph DiFante, Wilbert Fountain and Albert Benjamin (*Montano, Summers, Mullen, Manuel, Owens & Gregorio,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

This case concerns the duty owed to the public by municipal employees charged with maintaining and repairing public streets. Defendants are all employees of the Department of Public Works of the City of Camden. They are said to have allowed a dangerous condition to persist in a public street for many months and as a result to have caused injury to plaintiff. The City has never been a party to this case, presumably because plaintiff would have been barred by the failure to serve a timely notice of claim. The trial court granted summary judgment in favor of the all defendants. The Appellate Division affirmed in an unreported opinion. This Court then granted certification. 126 *N.J.* 328, 598 *A.*2d 886 (1991).

I

On November 11, 1986, plaintiff Eddie Chatman was standing in the street on the 28th block of Benson Street in Camden, leaning over the open hood of a parked car. A 1963 Chevrolet pick-up truck coming down the street at about five miles per hour hit a large hole in the street. Its passenger side door swung open, striking Mr. Chatman in the back, causing him serious injury. The street where the accident took place was one way, residential, and had cars parked on both sides.

Affidavits submitted by nearby residents describe the hole as "very large." Photos provided of the hole after the accident and after it had been filled show that the hole ran across much of the street. The driver of the truck stated that the hole had been in the street for at least seven to eight months and that he could not have avoided it. Chatman said that he could hear cars passing over the hole from inside his home. And, as the facts of the case suggest, the hole was large enough to cause the door of the pick-up truck to swing open.

The exact nature and cause of the hole is not clear from the record. It is alternatively referred to as a large hole, a pothole,

a "plumber's ditch" [1] and a "cave in" [2]. Chatman maintains that calls were made to the City by John Exum, a nearby resident, at least a year before the accident, complaining about the hole on Benson Street. Although Exum has submitted affidavits attesting to his having made those calls, the City states that it has no records of them. According to defendant employees, they and the City had no actual notice of the hole on Benson Street until after the accident. The first notice they received was on December 3, 1986, roughly twenty days after the accident, when an unidentified caller complained about the hole. On the following day it was repaired by a work crew of the Camden Public Works Department.

On January 19, 1988, Eddie Chatman and his wife, Sarah, filed a complaint against the driver of the pick-up truck and various unnamed maintenance personnel. (Reference hereinafter to "plaintiff" is to Eddie Chatman.) Because they did not meet the ninety-day notice requirement of the Tort Claims Act, the Chatmans were unable to include the City of Camden in their suit. After some delay, the City provided the names of those employees in the Department of Public Works responsible for maintaining Benson Street. Those six persons were added to the complaint on July 7, 1989. They were Walter Richardson, director of the Public Works Department; Wilbert Fountain, street superintendent; Albert Benjamin, assistant street

---

[1] A "plumber's ditch" is created when a contractor working on a plumbing problem cuts up the street. A permit is necessary for that action and the contractor is required to fill the hole with dirt and then return ten days later to dig it up again and fill it with concrete. The City then tops off the hole with asphalt. There is no record of any permits to dig plumber's ditches on the street during the three preceding years.

[2] A "cave in" occurs when a sewer or water line breaks and the dirt under the pavement is eroded. The hole in question is perpendicular to a fire hydrant and directly over a sewer line. The City is responsible for repairing the sewer mains whereas New Jersey Water Company is responsible for the water mains. At least one defendant suggests that the cause may have been a break in the water line, but New Jersey Water Company points to the sewer system as the more likely culprit.

superintendent in charge of the highway department; Clarence Miller, foreman responsible for the crews that fill potholes in the City; Walter Ray, a foreman responsible for street maintenance in the area including Benson Street; and Joseph DiFante, the City street inspector at the time of the accident.

The Public Works Department is generally responsible for maintaining and securing public property in the City of Camden. The Highway Division of the Department is in turn responsible for maintaining the roughly 250 miles of streets in the city. At the time of the accident, it had a total of fifty-five employees, six of whom were assigned to repair potholes. The Division operates on the basis of a complaint system. The City receives about 300 to 400 complaints daily. Based on the severity of the complaint, crews are sent out to take remedial action or perform inspections. All complaints are reviewed daily by the head of the Highway Division, a defendant in this action.

Work crews also independently identify street problems. Sometimes they simply call in complaints when they come across potholes or dangerous conditions. On at least some occasions they immediately repair the problem. In addition, there was at least one and perhaps more than one full time street inspector at the time of the accident. Joseph DiFante, also a defendant, was responsible for driving the streets of Camden supervising and inspecting road work by private contractors. He was responsible for insuring that those contractors filled plumber's ditches and that the City in turn topped the holes off.

When asked whether any inspections were made of the area *subsequent* to the accident, defendant Wilbert Fountain stated that an inspection of the area had been made on March 3, 1986. That would have been more than eight months before the accident. The date, however, seems to have been an error. Fountain said they found two plumber's ditches that had been repaired on December 3, 1986. Thus, the inspection was most

likely made after the accident. Aside from that inspection, there is no evidence that employees of the Department inspected the area on Benson Street.

In granting summary judgment in favor of defendants, the trial court held that plaintiff could not recover because a jury could not find that any of defendants had either actual or constructive knowledge of the hole. Further, even if a jury could have found that defendants had notice, *N.J.S.A.* 59:3–7 immunized defendants from suit by barring claims brought against public employees for negligent inspection. The court also found defendants immune from suit because their discretionary decisions fell within the ambit of *N.J.S.A.* 59:3–2d, which provides a qualified immunity for the discretionary acts of public employees. Finally, the trial court determined that *N.J.S.A.* 59:4–2, which provides the standards for imposing liability on a public entity for dangerous conditions on public property, did not apply to defendants. On appeal, the Appellate Division affirmed, adopting the reasoning of the trial court and ruling that plaintiff had not shown "any duty toward this condition [the hole in the street] which is not subject to the immunity provision of the Act."

In determining the issues posed by this appeal, we rely on the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 to :12–3 (Act), which governs claims against public entities and public employees. We emphasize initially that the Act reestablishes sovereign immunity for public entities, but does not similarly shield public employees. *Longo v. Santoro*, 195 *N.J.Super.* 507, 515, 480 *A.*2d 934 (App.Div.), *certif. den.*, 99 *N.J.* 210, 491 *A.*2d 706 (1984). A public entity is deemed "not liable for an injury" except as provided in the Act, *N.J.S.A.* 59:2–1. In contrast, a public employee "is liable for injury" except as otherwise provided. *N.J.S.A.* 59:3–1. Thus, the analysis for determining public-employee liability differs markedly from the analysis for determining public-entity liability. That differential treatment of public employees and entities by the Tort

Claims Act reflects longstanding legal principles in the State and explains in large part the apparent anomaly that public employees may be exposed to greater liability than their public employers. While some may be surprised that public employees and employers are treated differently for tort purposes, the distinctions are readily explainable given the evolution of tort law in New Jersey. Moreover, it should be emphasized that the apparent harshness of exposing employees to greater liability under certain limited circumstances is just that—apparent. In practice, the longstanding policy of indemnifying public employees shields them from ruinous tort penalties.

We now hold that under the Tort Claims Act and relevant common law jurisprudence public employees owe a duty to members of the public to protect against the dangerous condition of public property and that such employees are not immune from suit under the "inspection" immunities of the Act. With respect to protecting against the dangerous condition of public property, we determine that the standard of care applicable to public employees depends on the nature of their duties. If those duties are ministerial and non-discretionary, public employees may be found liable if they failed to use reasonable care. If those duties require the exercise of discretion or policy decisions, public employees may be found liable if their failure to use care was palpably unreasonable. These rules insure that innocent victims are not left with the financial burden imposed on them by other persons' negligence while at the same time safeguarding the legitimate policy-making functions of local government. We hold, also, that the notice-of-claim provisions of the Tort Claims Act do not apply to public employees and that actions against them are governed by the ordinary statute of limitations. Accordingly, we reverse the judgment below and remand the matter for trial.

## II

The Legislature, in providing for the liability of public employees under the Tort Claims Act, determined to preserve

their common law liability. The Act provides expressly that "except as otherwise provided" public employees shall be liable "to the same extent as a private person." *N.J.S.A.* 59:3–1(a). In doing so the act reaffirms the common law principle that with respect to private persons immunity is the exception rather than the rule. In contrast, the Legislature used exactly the opposite language to describe the treatment of public entities. They are *not* liable except as otherwise provided by the act. *N.J.S.A.* 59:2–1(a). This in turn codifies the common law principle that with respect to public entities immunity is the rule and liability the exception. The use of these two opposite formulations was no mistake of draftsmanship. Rather, it reflected the pre-Tort Claims Act treatment of public employees and employers. Moreover, the authors of the Tort Claims Act were well aware that the California law upon which they drew heavily included many situations where public employee liability was broader than entity liability. *See Report of New Jersey Attorney General's Task Force on Sovereign Immunity* 103–04 (1972) (discussing situations under California law in which public employee liability was broader than that of public employers).

The Tort Claims Act expresses a clear intent to preserve the common law principles governing public employee liability where they are not subjected to specific immunities provided by the Act. For example, the Act provides that the liability of a public employee is subject to any immunity of a public employee provided by law. *N.J.S.A.* 59:3–1(b). The use of the words "any immunity of the public employee provided *by law*" was clearly calculated. The Legislature expressly departed from the California Tort Claims Act, which in many respects was a model for the New Jersey Act. *See, e.g., Daniel v. State,* 239 *N.J.Super.* 563, 592, 571 *A.*2d 1329 (App.Div.), *certif. den.,* 122 *N.J.* 325, 585 *A.*2d 343 (1990); *Burg v. State,* 147 *N.J.Super.* 316, 322, 371 *A.*2d 308 (App.Div), *certif. den.,* 75 *N.J.* 11, 379 *A.*2d 242 (1977). The corresponding subsection of the California Act, Cal.Gov't Code sec. 815(b), states that the liability of a

public entity is "subject to any immunity of the public entity provided by *statute.*" (emphasis added.) "The New Jersey Legislature deleted the words 'provided by statute' to allow the continuing development of categorical common-law immunities." *Guerriero v. Palmer,* 175 *N.J.Super.* 1, 4 n. 1, 417 *A.*2d 547 (Law Div.1979). *See also Steward v. Magnolia,* 134 *N.J.Super.* 312, 321, 340 *A.*2d 678 (App.Div.1975) ("the term 'immunity' as used in *N.J.S.A.* 59:3–1(b) relates only to those exemptions from liability for particular kinds of conduct or activities as were previously given to public employees by case law"). Hence, our search for standards governing the liability of public employees with respect to public property must take us back to common law. That search will reveal that the standards defining liability were varied. Further, at common law the liability of public employees was distinct from and often more extensive than that of their municipal employers.

Before the 1970s the legal doctrine of sovereign immunity clothed the State with absolute protection from tort suits. *See, e.g., Fitzgerald v. Palmer,* 47 *N.J.* 106, 219 *A.*2d 512 (1966). The common law afforded no similar blanket protection to public municipalities. Rather than the blanket immunity that applies to the State, liability at the municipal level of government was governed by complex and often overlapping rules of liability.

At common law, a municipality could be held liable for dangerous conditions on public property if through an officer in a position of general authority it ordered an employee to perform the negligent action. *See Florio v. Jersey,* 101 *N.J.L.* 535, 537, 129 *A.* 470 (E. & A.1925); *Reilly v. City of New Brunswick,* 92 *N.J.L.* 547, 108 *A.* 107 (E. & A.1919); *Jersey City v. Kiernan,* 50 *N.J.L.* 246, 13 *A.* 170 (E. & A.1888). If the injury arose out of the proprietary function of the municipality, such as the use of property for the purpose of raising revenue, the municipality would be liable under the same circumstances as a private person, without regard to whether nonfeasance or misfeasance was involved. *Fay v. City of Trenton,* 126 *N.J.L.*

52, 18 *A.*2d 66 (E. & A.1941); *Martin v. Asbury Park*, 111 *N.J.L.* 364, 168 *A.* 612 (E. & A.1933); *cf. B.W. King, Inc. v. West New York*, 49 *N.J.* 318, 230 *A.*2d 133 (1967) (rejecting distinction between proprietary and governmental ownership). Further, with respect to the performance of governmental functions recovery was allowed on a showing of negligence if the injury arose from the creation of a private nuisance threatening a specific person or groups of persons. *See, e.g., Casey v. Bridgewater Township*, 107 *N.J.L.* 163, 151 *A.* 603 (E. & A.1930); *Pray v. Mayor of Jersey City*, 32 *N.J.L.* 394, 396 (Sup.Ct.1868). But if a public nuisance, such as a ditch in a public road, threatened the public in general, liability required active wrongdoing. *Milstrey v. Hackensack*, 6 *N.J.* 400, 412, 79 *A.*2d 37 (1951); *Bengivenga v. Plainfield*, 128 *N.J.L.* 418, 423–25, 26 *A.*2d 288 (E. & A.1942); *Newman v. Ocean Township*, 127 *N.J.L.* 287, 21 *A.*2d 841 (E. & A.1941); *Lentini v. Montclair*, 122 *N.J.L.* 355, 356, 5 *A.*2d 692 (Sup.Ct.1939); *Fisher v. Nutley*, 120 *N.J.L.* 290, 199 *A.* 40 (E. & A.1938); *Florio, supra*, 101 *N.J.L.* at 539, 129 *A.* 470.

In addition, municipalities at common law were liable only if high level officers of the municipal corporation were negligent in ordering actions that were harmful. *Id.* at 537, 129 *A.* 470. If the municipality itself was found to have acted negligently, no liability would attach to the employee who simply acted on the orders of the municipality. On the other hand, the municipality would not be held liable where an employee engaged in negligence or negligently performed his or her duties. *Reilly v. City of New Brunswick*, 92 *N.J.L.* 547, 108 *A.* 107 (E. & A.1919). It was not until 1960, that municipalities came to be liable for the tortious conduct of their employees under a theory of *respondeat superior. McAndrew v. Mularchuk*, 33 *N.J.* 172, 162 *A.*2d 820.

Municipal tort liability relating to dangerous street conditions reflected this doctrinal complexity. Most American courts, including New Jersey, carried over the English rule that, having constructed public streets, the municipality and its employ-

ees had a corresponding duty to maintain them in a safe condition. *Municipal Corporations, Defects of Obstructions in Streets of other Public Ways*, 63 *C.J.S.* sec. 782 (1950); McQuillan, *Liability for Defective Streets, Municipal Corporations*, § 54.15a (1991); Harry Stevenson, *Law of Streets and Sidewalks in New Jersey*, 3 Rut.L.Rev. 19 (1949). *See also Bechefsky v. Newark*, 59 *N.J.Super.* 487, 492–93, 158 *A*.2d 214 (App.Div.1960) (responsibility of municipalities "from the earliest days to see to the maintenance and care of public thoroughfares."). However, New Jersey differed from many other jurisdictions in limiting liability for dangerous street conditions to situations involving misfeasance. *Hayden v. Curley*, 34 *N.J.* 420, 169 *A*.2d 809 (1961); *Milstrey, supra*, 6 *N.J.* at 412, 79 *A*.2d 37; *Slutsky v. Bohen*, 120 *N.J.L.* 102, 198 *A.* 389 (Sup.Ct. 1938); *Buckalew v. Freeholders of Middlesex*, 91 *N.J.L.* 517, 104 *A.* 308 (E. & A.1918). Also, New Jersey courts generally held that absent statutory language the obligation to maintain roads in safe conditions could not be enforced through tort. *Carter v. Mayor of Rahway*, 57 *N.J.L.* 196, 30 *A.* 863 (E. & A.1894) (holding that liability for failure to repair a municipal street arises only if established by a statute). Nonetheless, when the Legislature in 1933 immunized municipalities from liability in tort for injuries arising from the use of public property, it expressly exempted injuries arising from the use of streets and public ways. *N.J.S.A.* 18:5–30 (*R.S.*, since repealed); *Cohen v. Morristown*, 15 *N.J.Misc.* 288, 190 *A.* 851 (Sup.Ct.1937); *Hammond v. County of Monmouth*, 117 *N.J.L.* 11, 186 *A.* 452 (Sup.Ct.1936). In doing so, the Legislature recognized the special nature of the duties owed to persons using public streets.

Further, although courts at common law placed great weight on the distinction between misfeasance and nonfeasance, they also questioned its coherence. *See, e.g., Hammond v. County of Monmouth, supra*, 117 *N.J.L.* at 12, 186 *A.* 452 ("In reason and logic, it is difficult to understand why there should be any distinction between passive and active wrongdoing."). The

criticism of the distinction between misfeasance and nonfeasance increased in the 1960s, *Jackson v. Hankinson*, 51 *N.J.* 230, 238 *A*.2d 685 (1968), and courts began to emphasize an alternative dichotomy for establishing liability, namely, the distinction between ministerial and discretionary acts. *See Visidor Corp. v. Borough of Cliffside Park*, 48 *N.J.* 214, 225 *A*.2d 105 (1966), *cert. den.*, 386 *U.S.* 972, 87 *S.Ct.* 1166, 18 *L.Ed.*2d 132 (1969); *Bergen v. Koppenal*, 52 *N.J.* 478, 246 *A*.2d 442 (1968); *Amelchenko v. Freehold Borough*, 42 *N.J.* 541, 201 *A*.2d 726 (1964).

Historically, the tort exposure of municipal employees has not only been distinct from that of their municipal employers, it has been broader. At common law public employees were liable for injury caused by their acts "to the same extent as private persons," unless granted immunity. *Kisielewski v. State of New Jersey*, 68 *N.J.Super.* 258, 262, 172 *A*.2d 203 (App.Div.1961); *Florio, supra*, 101 *N.J.L.* at 539, 129 *A.* 470. Public employees were liable not only for negligent actions in the course of their employment but also for negligent performance of their municipal duties. *Milstrey v. Hackensack, supra*, 6 *N.J.* 400, 79 *A*.2d 37; *Florio, supra*, 101 *N.J.L.* at 540, 129 *A.* 470. However, like the municipalities for which they worked, public employees were liable only if their negligence involved active wrongdoing. *See Milstrey, supra*, 6 *N.J.* at 412, 79 *A*.2d 37; *Harris v. State*, 118 *N.J.Super.* 384, 288 *A*.2d 36 (App.Div. 1972); *Czyzewski v. Schwartz*, 110 *N.J.Super.* 255, 265 *A*.2d 173 (App.Div.1970); *Kisielewiski, supra*, 68 *N.J.Super.* 258, 172 *A*.2d 203; *Florio, supra*, 101 *N.J.L.* at 539, 129 *A.* 470. Further, as mentioned, public employees could be found liable in circumstances that would not result in municipal liability. *Reilly v. City of New Brunswick, supra*, 92 *N.J.L.* 547, 108 *A.* 107.

Moreover, when the Legislature provided immunity to municipalities in 1933 for accidents arising from the use of public grounds, buildings, and structures, it created an additional distinction between the liability of employees and that of munic-

ipal entities. That statute did not confer a similar immunity on municipal employees. *L.* 1933, *c.* 460; *N.J.S.A.* 18:5–30 (*R.S.,* since repealed). In *Falcone v. Board of Educ. of Newark,* 17 *N.J.Misc.* 75, 4 *A.*2d 687 (Cty.Ct.1939) the court explained that the differential treatment of municipal employees and entities was due to "the legislative belief that public policy would be better served by interposing responsibility for wrongful injuries to the person, solely upon the individuals who committed the wrongful acts and not also upon the public body itself." *Id.* at 76, 4 *A.*2d 687.

We can thus see that at common law public employees were exposed to liability more extensively than were their municipal employers. Further, in the years immediately proceeding the passage of the Tort Claims Act in 1972, the common law dealing with public employee and municipal liability was quite complicated, marked by great uncertainty, and in tremendous flux. In 1968 the Supreme Court described municipal tort law as "going through a metamorphosis." *Miehl v. Darpino, et al.,* 53 *N.J.* 49, 52, 247 *A.*2d 878 (1968). The increasingly suspect but not fully abandoned distinction between nonfeasance and misfeasance had determined the liability of public employees for most of the century. *See Jackson v. Hankinson, supra,* 51 *N.J.* 230, 238 *A.*2d 685 (criticizing act/omission distinction). Many of the traditional doctrines that had structured earlier case analysis had been expressly rejected. Other important rules had come under heavy criticism or been limited to narrow fact situations. And new substitutionary rules were not fully elaborated. *See, e.g., B.W. King, supra,* 49 *N.J.* at 324–35, 230 *A.*2d 133. Courts had begun to emphasize the distinction between ministerial and discretionary duties, *see Visidor Corp. v. Borough of Cliffside Park, supra,* 48 *N.J.* 214, 225 *A.*2d 105; *Bergen v. Koppenal, supra,* 52 *N.J.* 478, 246 *A.*2d 442, but had not used it to analyze the liability of municipal employees.

This backdrop serves to sharpen the effect of the Tort Claims Act on the prior treatment of municipal and public employee

liability. The Act in significant ways narrows the scope of that liability for municipalities. Conversely, the Act significantly expands the liability of public employees. We redirect our attention to the specific issues posed by this appeal from that perspective.

## III

■ The trial court believed that one aspect of plaintiff's cause of action against several of the employees was negligence arising out of a duty to inspect the public streets. The court determined that the public employees were immune with respect to conduct relating to a breach of the duty to inspect the property. The basis for that determination was *N.J.S.A.* 59:3–7, which in part, provides:

> A public employee is not liable for injury caused by his failure to make an inspection, or by reason of making an inadequate or negligent inspection of any property.

The duty to inspect as an incident of the duty to maintain and assure the safeness of public property is distinct from the duty to inspect that is part of the regulatory authority of public employees over private property. The statute thus also provides "that nothing in this section shall exonerate ... a public employee from liability for failure to protect against a dangerous condition as provided in chapter 4." *N.J.S.A.* 57:3–7. The court in *Karczewski v. Nowicki*, 188 *N.J.Super.* 355, 457 *A.*2d 837 (App.Div.1982), held that *N.J.S.A.* 59:3–7 does not bar claims of negligent inspection brought against public employees when the accident is caused by a failure to protect against a dangerous condition of public property.

The legislative history of the Act supports that interpretation. The Legislative Comments indicate that the inspection immunity of *N.J.S.A.* 59:2–6 does not absolve municipalities or their employees from the duty to inspect public property for dangerous conditions. Rather, the immunity is designed to encourage inspection activities that benefit the public generally. The Comments state that "[t]he inclusion of the reference to

Chapter 4 is intended to indicate that this immunity shall not apply when dangerous conditions on public property are involved." Legislative Comment on *N.J.S.A.* 59:2–6. Although the commentary does not explain the purpose of *N.J.S.A.* 59:3–7, it does explain *N.J.S.A.* 59:2–6, which grants the same immunity to public entities. Because the sections contain almost identical language, the comment to *N.J.S.A.* 59:2–6 can guide this Court in discerning the scope of *N.J.S.A.* 59:3–7. *See Longo v. Santoro, supra,* 195 *N.J.Super.* 507, 515, 480 *A.*2d 934 (court interpreted *N.J.S.A.* 59:3–2, the provision granting discretionary immunity to public employees, by reference to cases construing *N.J.S.A.* 59:2–3, the parallel provision applicable to the public entity). Chapter four defines *public property* as "real or personal property owned or controlled by the public entity, but does not include easements, encroachments and other property that are located on the property of the public entity but are not owned or controlled by the public entity." *N.J.S.A.* 59:4–1c; *see Cadmus v. Long Branch Board of Educ.,* 155 *N.J.Super.* 42, 48, 382 *A.*2d 98 (Law Div.1977) ("It is only with respect to public property that the Tort Claims Act evinces any legislative intention that there be imposition of liability for omission in inspection (or for negligent inspection)."); *cf. Bombace v. City of Newark,* 125 *N.J.* 361, 593 *A.*2d 335 (1991) (indicating immunity for negligent housing code inspection).

Because the Legislature patterned the New Jersey Tort Claims Act on the California Tort Claims Act, the California statute is instructive. *See, e.g., Daniel v. State, supra,* 239 *N.J.Super.* at 592, 571 *A.*2d 1329; *Burg v. State, supra,* 147 *N.J.Super.* at 322, 371 *A.*2d 308. The California counterpart to *N.J.S.A.* 59:3–7 provides that "[a] public employee is not liable for injury" with respect to deficient inspections relating to the safeness of non-public property. Cal.Claims and Actions Code § 821.4 (West 1980) (California Act). The definition of public property under the California Act contains the precise terminology used in the New Jersey Act. *See N.J.S.A.* 59:4–1c. Hence, the policy expressed by the California Act to apply the inspec-

tion immunity only to non-public property mirrors a similar policy implicit in the New Jersey Act.

Thus, when the public entity neither owns nor controls the property, *N.J.S.A.* 59:3–7 bars claims predicated on negligent inspection. On the other hand, because the public entity's responsibility for the care of public property is direct, nondelegable, and exclusive, there is no independent need to encourage the proper discharge of that duty. Hence, the Legislature reasonably chose to allow suits for negligent inspection when the public entity owns or controls the property that gives rise to injury. *See Karczewski, supra,* 188 *N.J.Super.* 355, 457 *A.*2d 837; *Kenney v. Scientific, Inc.,* 204 *N.J.Super.* 228, 497 *A.*2d 1310 (L.Div.1985) (*N.J.S.A.* 59:2–6 barred plaintiff's claim of negligent maintenance against public entity because public entity did not own or control the property). Inasmuch as "a road or highway falls within the definition of public property," *Johnson v. Essex County,* 223 *N.J.Super.* 239, 256, 538 *A.*2d 448 (L.Div.1987), inspections related to public ways would not be accorded immunity.

We conclude that *N.J.S.A.* 59:3–7 does not immunize defendants from liability stemming from negligent inspection of public streets.

## IV

The central remaining issue is the duty that public employees owe the public with respect to the dangerous condition of public property. The Tort Claims Act expressly provides that public entities are liable for injuries caused by dangerous conditions on public property, but only if the entity's action or failure to act was palpably unreasonable. *N.J.S.A.* 59:4–2. The Legislative Comments indicate that the section follows the rule articulated in *Bergen v. Koppenal, supra,* 52 *N.J.* at 480, 246 *A.*2d 442, that "when a public entity exercises or fails to exercise its discretion in determining what action should or should not be taken to protect against the dangerous condition that judgment

should only be reversed where it is clear to the court that it was palpably unreasonable."

The Act, however, contains no corresponding provision dealing with the liability of public employees for dangerous conditions on public property. The one reference to dangerous conditions on public property as they relate to public employees is ambiguous. To reiterate, that reference, in chapter 3, *N.J.S.A.* 59:3–7, states that the immunity for negligent inspections shall not exonerate a public employee from liability for failure to protect against a dangerous condition as provided in chapter 4, *N.J.S.A.* 59:4–1 to 4–9.

One might argue that the immunity exception of section 59:3–7, by reference, incorporates into the public employee chapter the liability of chapter 4, and, by implication, its palpable unreasonableness standard of care. *See Karczewski, supra,* 188 *N.J.Super.* at 360, 457 *A.*2d 837. The negligent inspection immunity of *N.J.S.A.* 59:3–7, however, is one of a number of related provisions that grant specific immunities to both employees and entities. Its primary function is to confer immunity, not to establish liability. The legislative decision to exclude any express section on the liability of public employees with respect to dangerous conditions on public property was obviously calculated to perpetuate common-law liability. In contrast, the inclusion of the express reference to chapter 4 in the immunity provisions for negligent inspection was intended to do no more than limit the scope of that immunity.

That interpretation comports with the basic structure of the Tort Claims Act. The Act did provide common treatment of public entities and public employees in some respects. Thus, it abandoned the active wrongdoing standard, stating unequivocally that employees and entities are responsible for both their acts and their omissions. *N.J.S.A.* 59:2–2 and :3–1. In addition, the Act enhanced the immunity for discretionary decisions, providing that both municipalities and employees would be

liable for decisions allocating scarce resources only where their actions were palpably unreasonable. *N.J.S.A.* 59:2-3 and :3-2.

Nevertheless, for public entities, including both the State and local public entities such as municipalities, the Act reestablished blanket immunity subject to specific provisions establishing liability.[3] Because public entities were immune unless otherwise provided by the Act, there had to be an express section in order to impose liability on public entities with respect to public property. No such provision was necessary for public employees because their antecedent common-law liability for dangerous conditions on public property was expressly continued. *N.J.S.A.* 59:3-1(a).

 We are satisfied that when the Legislature provided for general liability of public employees, it intended that such liability would be guided by the common law, subject to the immunities provided in the Tort Claims Act. *See, e.g., Renz v. Penn Central,* 87 *N.J.* 437, 435 *A.*2d 540 (1981). Under that scheme, when public employees are involved in activities that require discretionary decisions regarding the allocation of resources, they are liable only when their actions have been palpably unreasonable. The qualified immunity expressed by the palpably unreasonable standard of liability is provided in *N.J.S.A.* 59:3-2(d), which states:

> A public employee is not liable for the exercise of discretion when, in the face of competing demands, he determines whether and how to utilize or apply existing resources, including those allocated for equipment, facilities and personnel unless a court concludes that the determination of the public employee was palpably unreasonable.

---

[3]However, even with regard to the liability and immunity of municipalities, the Legislature incorporated the evolving common-law principles. The Act made the provisions establishing liability themselves subject to common-law immunities. As Judge Brody said in *Guerriero, supra,* 175 *N.J.Super.* at 5, 417 *A.*2d 547, the Act "doubles back" on itself by stating that "any liability of a public entity established by this act is subject to any immunity of the public entity." *N.J.S.A.* 59:2-1.

On the other hand, when qualified immunity for discretionary decision-making does not apply, public employees are liable in tort under common-law principles of ordinary negligence. Thus section 59:3-2(d) goes on to provide:

> Nothing in this section shall exonerate a public employee for negligence arising out of his acts or omissions in carrying out his ministerial functions.

■ We conclude that when dangerous conditions on public property arise or persist because of discretionary or policy decisions regarding the allocation of public funds, resources, or staff, public employees are judged against a standard of palpable unreasonableness. The standard of review is relatively searching because it requires the assessment of competing demands. The employee must show that there were competing demands and that a discretionary choice was made between those demands. *Lopez v. City of Elizabeth*, 245 *N.J.Super.* 153, 584 *A.*2d 825 (App.Div.1991); *Longo v. Santoro, supra*, 195 *N.J.Super.* 507, 480 *A.*2d 934.

■ We also conclude that when a municipality has decided to allocate resources in a particular way and the public employee's duties involve only the expenditure or application of those resources, the employee's liability in tort is governed by standards of ordinary negligence. *See N.J.S.A.* 59:3-1(a). Under the structure of the Tort Claims Act, that standard is always invoked with regard to public employees when no immunity applies. In those cases the employee's duty can be understood to be ministerial because it resulted from actions undertaken to carry out of decisions or policies implicating the discretion exercised by superior employees. As at common law and as with private employees, the municipal employee is held liable for carrying out his or her duties in an unreasonable manner. *Florio, supra*, 101 *N.J.L.* at 539, 129 *A.* 470.

The statutory resolution of those issue is consistent with the prior common-law jurisprudence and with legislative policy. The policies working for and against liability in the area of dangerous conditions on public property play out differently in

the cases of municipal employees and entities. Balanced against the recognition that public entities and in many cases public employees are in the best position to maintain public ways and protect users from hazardous conditions is the countervailing interest in preserving executive policy-making authority. Courts, like the Legislature, recognize that public entities have limited resources to address dangerous conditions as well as a host of other public problems. Deciding how to spend limited resources necessarily involves balancing short term solutions against long term ones, weighing the interests of different constituencies, and making a myriad of complex predictions. If courts subject such decisions to tort liability, they substitute the judgment of the judicial branch for the that of elected and appointed policy makers. *Visidor Corp. v. Cliffside Park, supra,* 48 *N.J.* at 223-23, 225 *A.*2d 105; *Amelchenko v. Borough of Freehold, supra,* 42 *N.J.* at 549, 201 *A.*2d 726; *N.J.S.A.* 59:3-2(d); Comments to *L.* 1972, c. 45. Based on these considerations public entities are granted a qualified immunity with regard to accidents on public property, being held liable only where they have acted with palpable unreasonableness.

In contrast, public employees, particularly those who occupy lower-level positions in the municipality, often carry out policies and programs already designed by the municipality. Although the work of almost all employees involves considerable discretion, the arguments for shielding *policy* decisions by public entities lose their force with respect to persons who have relatively-well-defined responsibilities. *See Czyzewski v. Schwartz, supra,* 110 *N.J.Super.* 255, 265 *A.*2d 173 (state courts have tended to "restrict absolute immunity to superior officers only"). That is one reason why the liability of public employees at common law was effectively broader than that of their employers. Whereas the public entity is responsible for the maintenance of all public property, individual employees generally have specific job descriptions and responsibilities. *See Whaley v. County of Hudson,* 146 *N.J.Super.* 76, 77, 368

*A.*2d 980 (Law Div.1976) ("The act extends to public entities the usual obligations of private parties with respect to dangerous conditions on their property, subject to a special provision in recognition of the vast amount of property the public entities own."). Because the authority of public employees is confined, that their responsibility for dangerous conditions coincide with their defined authority is appropriate. *Harris v. State*, 118 *N.J.Super.* 384, 288 *A.*2d 36 (App.Div.1972); *Falcone, supra,* 17 *N.J.Misc.* at 76, 4 *A.*2d 687.

It should be emphasized that the differential treatment of public employee and entity liability by the Tort Claims Act in this case is limited to dangerous conditions on public property. Where an employee otherwise engages in negligence in the course of his or her employment the entity will have equivalent liability under the respondeat superior provisions of the Act. *N.J.S.A.* 59:2-2(a). Moreover, because municipal government generally indemnify their employees, and the State is required to do so by law, the limited difference in treatment in this case is unlikely to result in serious hardship on employees.

In this case the factual record is not sufficiently developed to determine why the hole or ditch remained unrepaired over such a long period of time. If, for example, the failure to repair the hole was the result of a policy of maintaining only those streets in one part of the City or repairing only ditches and not potholes, then the standard of liability would be whether the decision was palpably unreasonable. If, on the other hand, the failure to patch the hole was the result of a failure adequately to process a complaint that would otherwise have been responded to or to follow up a work order, the standard of liability would be negligence.

Although the factual background remains somewhat unclear at this point, the record is sufficient to defeat a motion for summary judgment. The questions of whether a defendant acted palpably unreasonably or negligently under the circumstances are ones that a jury should decide. *Rochinsky v. State*

110 *N.J.* 399, 410, 541 *A.*2d 1029 (1988); *McGowan v. Borough of Eatontown,* 151 *N.J.Super.* 440, 376 *A.*2d 1327 (App.Div. 1977). The length of time during which the hole existed as well as its alleged size create a reasonable inference that the defendant employees had either actual or constructive notice of the hole, as does the affidavit of a neighbor who reported the hole. *See Milacci v. Mato Realty Co.,* 217 *N.J.Super.* 297, 525 *A.*2d 1120 (App.Div.1987); *Taverna v. City of Hoboken,* 43 *N.J.Super.* 160, 128 *A.*2d 11 (App.Div.1956). Moreover, whether notice and a failure to act would give rise to liability again depends on the standard practice in the City in responding to that type of condition. No evidence suggests that anyone decided not to repair the hole in the street. The record indicates that the City had allocated at least some employees and resources to inspecting and maintaining public streets. *Cf. Mitchell v. City of Trenton,* 163 *N.J.Super.* 287, 290, 394 *A.*2d 886 (App.Div.1978) (no resources allocated by municipality to repair curbing). The evidence reveals a sufficient basis for a triable issue relating to whether the failure to repair the hole was the result of the determination of policy or the carrying out of policy decisions already made, and, respectively, whether such failure was palpably unreasonable or merely unreasonable.

V

Our consideration of a threshold notice issue is now more fully informed by our understanding of the standards and bases for recognizing liability on the part of public employees with respect to their failure to protect against dangerous conditions of public property.

Under *N.J.S.A.* 59:8–8 a person injured as the result of the acts or omissions of a public entity must file a claim with that entity within ninety days. The chapter governing the procedures for bringing claims against public entities does not mention public employees, and no similar statute of limitations

governs claims against public employees. Here, plaintiff did not meet the ninety-day notice requirement.

The difference between the statute of limitations for public entities and public employees creates an apparent anomaly. The Tort Claims Act requires the state government to indemnify its employees for negligent acts and omissions in the scope of employment. Municipal governments are authorized but not required to indemnify their employees. *N.J.S.A.* 59:10-4. Most do indemnify their employees. That means that the municipality may bear the cost of a judgment that could not be lodged directly against it. In this case, although plaintiff is barred from directly suing the municipality, he can accomplish the same goal by going through the employees.

The differences between the two limitation periods does not appear to be an accident but instead the result of the peculiar development of municipal-government and municipal-employee liability. As the Appellate Division emphasized in *Karczewski v. Nowicki, supra,* 188 *N.J.Super.* at 359, 457 *A.*2d 837, the overriding purpose of the Tort Claims Act was to do away with the unjust results of the traditional doctrine of sovereign immunity. A negligence suit against a public employee at common law was subject only to the prevailing statute of limitations. Because the Act incorporates the common law principles, we cannot impute to the Legislature an intent to limit a plaintiff's right of action by means of a ninety-day-notice provision that applies expressly against public entities. *Ibid.* Such a result is also consistent with the interpretation given to earlier statutory treatment of municipal entity-employee liability. The 1933 statute granting immunity to municipalities for injuries arising on public property did not apply to torts of employees, resulting in the same apparent anomaly, namely, that a municipality might bear the ultimate costs of a suit that could not be brought directly against it. *Falcone, supra,* 17 *N.J.Misc.* at 77, 4 *A.*2d 687. See discussion, *supra* at 408-409, 608 *A.*2d at 270-271.

The actual language of the Act does not easily allow another reading. The Act clearly limits the notice requirement to public entities and preserves the common-law liability of public employees. *Williams v. Adams,* 189 *N.J.Super.* 196, 198–99, 459 *A.*2d 707 (Law Div.1983) ("filing a claim against a public entity is not a prerequisite to suit against an individual employee, even when a claimant might thereby recover from the entity indirectly, through indemnification, what he could not recover directly") (citations omitted); *Lutz v. Semcer,* 126 *N.J.Super.* 288, 300, 314 *A.*2d 86 (Law Div.1974). The Act in this respect also follows the California Tort Claims Act. *Id.* at 299, 314 *A.*2d 86.

Plaintiff's cause of action against the employee defendants is thus preserved despite the lapse of the ninety-day period of limitations.

## VI

We conclude that plaintiff should be allowed to proceed with his case. The standard of liability to be applied to the conduct of the defendants will depend on the particular facts of the case. If the failure to repair the hazardous condition in the street was the result of a discretionary decision or a policy determination, defendants will be liable only if their acts or omissions were palpably unreasonable. If the persistence of the hole was the product of ministerial or nondiscretionary conduct rather than a decision regarding how to allocate limited resources, then defendants are liable in negligence to the same extent as private persons.

We reverse the judgment of the Appellate Division affirming the summary judgment in favor of defendants and remand for trial.

O'HERN, J., dissenting.

The majority's interpretation of the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 to :12–3 (the Act), produces the anomalous

result of saddling the lowest-level public employee with the greatest responsibility to pay damages to those injured by defective conditions of public property. Although the majority's approach to liability can be reached by reading some of the Act's provisions in isolation, such a result conflicts with the Act's overall structure. The result reached by the majority is the only instance under the Act that I can discern in which the public employee's duty when acting within the scope of employment is not commensurate with the scope of the employer's liability. Additionally, the majority's result conflicts with a fair reading of the Act's provisions and the Legislature's attempt to equate the duties and liabilities of public entities and public employees with respect to the defective condition of public property. Those provisions dealing with the condition of public property define the duties and liabilities of public entities and public employees identically.[1]

| | |
|---|---|
| *A public entity is not liable* for injury caused by a failure to inspect or negligent inspection of property; except, a public entity may be liable for "failure to protect against a dangerous condition *as provided in chapter 4.*" *N.J.S.A.* 59:2–6 (emphasis added). | *A public employee is not liable* for injury caused by his or her failure to inspect or negligent inspection of property; except, a public employee may be liable for "failure to protect against a dangerous condition *as provided in chapter 4.*" *N.J.S.A.* 59:3–7 (emphasis added). |

Under chapter four of the Act, a public entity may be held liable for injuries proximately caused by the dangerous condition of its property if either: (1) the dangerous condition is created by a public employee's negligent or wrongful act or omission; or
(2) the public entity had notice of the dangerous condition a sufficient time before the injury to have taken measures to protect against the dangerous condition.

---

[1]For ease of analysis, I omit those provisions that define a dangerous condition, *N.J.S.A.* 59:4–1, and the required forms of notice, *N.J.S.A.* 59:4–3.

However, in either case, liability will be imposed only when the public entity's action or failure to take action to protect against the dangerous condition is "palpably unreasonable." *N.J.S.A.* 59:4–2.

What action or inaction of a public entity can possibly be "palpably unreasonable" other than the activities of its employees? Let us take this case as an example and assume that either plaintiff, his friends, or his family had called the Department of Public Works to complain about the condition of the road. Assume further that the commissioner of streets had dispatched a road superintendent and inspector of streets to look at the condition. However, before arriving at Benson Street, the two employees had stopped for a cup of coffee that delayed their arrival until after the accident had occurred. A jury might find that that conduct, although not in bad faith, amounted to a negligent failure to discharge their duties.

Should the public entity be able to defend on the basis that its actions were not "palpably unreasonable" but leave its employees to pay the verdict under principles of ordinary negligence? One may say that that result will never happen, but the Act does not require indemnification of employees by local public entities. *N.J.S.A.* 59:10–4. A cost-cutting budget analyst may find elimination of coverage for employees a good place to cut liability-insurance premiums. The majority has provided an interesting retrospective on common-law doctrines of governmental immunity from the 1860s to the 1960s. *Ante* at 404–408, 608 *A.*2d 268–270. The majority's analysis, however, has made no effort to harmonize the common law with the Act, and is as though the Tort Claims Act of 1972 had never been enacted. The common-law scheme espoused by the majority of holding public employees liable for their torts under principles of ordinary negligence, while, in effect, exonerating the public entity, *ante* at 404, 608 *A.*2d 268, is an anachronism.

"The liability of the individual official for wrongdoing committed in the course of his duty * * * is essentially a relic from past centuries when government was in the hands of a few prominent, independent and substantial persons, so-called Public Officers, who were in no way responsible to ministers or elected legislatures or councils.... Such a doctrine is utterly unsuited to

the twentieth-century state, in which the Public Officer has been superseded by armies of anonymous and obscure civil servants, acting directly under the orders of their superiors, who are ultimately responsible to an elected body. The exclusive liability of the individual officer is a doctrine typical of a highly individualized common law. It is of decreasing value today."

[5 Fowler V. Harper, Fleming James, Jr. & Oscar S. Gray, *The Law of Torts*, § 29.9 at 662–63 (2d ed. 1986) (Harper and James) (quoting Robson, *Report of the Committee on Ministers' Powers*, 3 *Pol.Sci.Q.* 346–58 (1932)).]

Did the Legislature intend the public employee to bear exclusive liability for negligent inspection of public property? Under the majority's interpretation of the Act, the public employee's duty is greater than that owed by the employing entity only in the instance of a dangerous condition of public property. For example, had a Camden City truck driver struck plaintiff, principles of ordinary negligence would have applied to the duties of the employee and the responsibility of the employer. See *N.J.S.A.* 59:3–1a and *N.J.S.A.* 59:2–2a. Why, when there is a defective condition of property, should the public employee have a greater duty than the city to protect the public against harm? Recall that in almost every other instance under the Act, the pattern of duty/liability is the same.[2]

| *A public entity is not liable for:* | *A public employee is not liable for:* |
|---|---|
| (1) legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature. *N.J.S.A.* 59:2–3b. | (1) legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature. *N.J.S.A.* 59:3–2b. |
| (2) The exercise of discretion in determining whether to provide resources for governmental services. *N.J.S.A.* 59:2–3c. | (2) The exercise of discretion in determining whether to provide resources for governmental services. *N.J.S.A.* 59:3–2c. |

[2]For convenience, I recite only a shorthand version of the corresponding provisions of the Act concerning the duties and liabilities of a public entity and public employer.

(3) The exercise of discretion when, in the face of competing demands, it determines whether and how to allocate resources; provided that the public entity is responsible for acts or omissions of employees in carrying out ministerial functions. *N.J.S.A.* 59:2–3d.

(3) The exercise of discretion when, in the face of competing demands, the employee determines whether and how to allocate resources; provided that the employee shall remain liable for negligence in carrying out ministerial functions. *N.J.S.A.* 59:3–2d.

(4) For injuries caused by the termination or reduction of benefits under a public assistance program. *N.J.S.A.* 59:2–8.

(4) For damages resulting from the termination or reduction of benefits under a public assistance program. *N.J.S.A.* 59:3–12.

Under the majority's view, only in the case of public property is the pattern of duty/liability broken:

*The public entity is not liable* for the dangerous condition of land attributable to negligent failure to act except in the case of "palpably unreasonable" acts or omissions.

*The public employee is liable* for the dangerous condition of land attributable to negligent failure to act.

The Legislature had to qualify the employee's immunity for negligent inspection or failure to inspect public property because the public entity would otherwise have incurred no liability for the dangerous condition of its property. Under *N.J.S.A.* 59:2–2b, "[a] public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable." Because the entity's liability for failure "to protect against the [dangerous] condition" under *N.J.S.A.* 59:4–2 can result only from the acts or omissions of public employees, public employees must also lose their immuni-

ty to the extent of the entity's liability. That stripping of the public employee of immunity in order to hold the public entity liable for the dangerous condition of its property is turned on its head when interpreted to enhance the duty of the lowest-paid employee beyond that of the employee's superiors or even the city itself.[3] The majority's interpretation has thus created an "inverted pyramid" for public liability—because neither the public entity nor the superior shares the liability, "any recovery must come from the financially weakest link in the chain." Harper and James, *supra*, § 29.9, at 662.

Generally speaking, when we interpret statutes, we attempt to reach the result that we believe the Legislature would have intended. *See Medical Soc'y of New Jersey v. New Jersey Dep't of Law and Pub. Safety*, 120 *N.J.* 18, 26–27, 575 *A.*2d 1348 (1990). We seek to achieve coherence in statutory law and, whenever possible, to harmonize the separate provisions of an act with the more general principles and policies of the law. *Denbo v. Township of Moorestown*, 23 *N.J.* 476, 481–82, 129 *A.*2d 710 (1957).

Other jurisdictions that have considered the scope of public-employee immunity have also addressed the issue of indemnification. When California expanded the scope of public-employee responsibility to cover the duty to warn a foster family about the dangerous character of a paroled youngster, it reasoned:

The public employee need not suffer concern over the possibility that he will be compelled to finance and oversee a tort suit filed against him personally; the

_____

[3]The duties and liabilities of public entities and public employees under the Act differ with respect to recreational facilities. *N.J.S.A.* 59:2–7 provides that a public entity's liability is linked to the dangerous condition of property under chapter four; however, under *N.J.S.A.* 59:3–11, a public employee's responsibility extends to "negligence in the supervision of a public recreational facility." Presumably, that dichotomy exists to protect the public from specific acts of negligence of a public employee, such as a lifeguard, but only in the event that the employee negligently undertakes supervision. See *Burroughs v. City of Atlantic City*, 234 *N.J.Super.* 208, 221–22, 560 *A.*2d 725 (App.Div.), *certif.denied*, 117 *N.J.* 647, 569 *A.*2d 1345 (1989). Note, however, that the public entity might have been held vicariously liable for the employee's negligence.

statute provides for defense by the public entity upon notice. * * * Moreover, the public employee faces only a slim danger of ultimate personal liability; such liability attaches only in the rare instances of injuries arising from acts either outside of the scope of employment or performed with actual fraud, corruption, or malice. [*Johnson v. State*, 69 *Cal.*2d 782, 73 *Cal.Rptr.* 240, 247, 447 *P.*2d 352, 359 (1968).]

In a case very similar to ours, *Stevenson v. Department of Transportation*, 290 Or. 3, 619 *P.*2d 247, 254 (1980), the Oregon Supreme Court held that both the public entity and the public road employees can be held liable for "determining the extent of the actual disrepair in each section [of the highway] and the kinds of hazards that existed as a result." The Oregon court reached that conclusion because it found under the Oregon Tort Claims Act a corresponding responsibility that required public bodies to defend and indemnify their employees against all tort claims arising out of performance of their duties, thus eliminating "the ground for concern by public employees that they can be held liable for a good faith failure to use reasonable care." *Id.* 619 *P.*2d at 253.

We should seek a comparable symmetry in our law. Even if the public employee's liability is regarded as a function of common law, as a matter of sound policy the Court can and should now decide that to reconcile the levels of liability of the public entity and the public employee makes the best sense of the statute and of the common law. The qualified immunities afforded to each should be the same. Under the majority's interpretation of the Act and of the common law, two incongruous results arise: (1) public employees, other than at the state level, are not guaranteed indemnification for negligent road supervision, but are held liable even for a good faith failure to use reasonable care; and (2) the State, which is required to indemnify its public employees, will thereby be held vicariously liable for the negligent maintenance of its roads even though the Legislature intended the State, as public entity, to be responsible solely for "palpably unreasonable" conditions of its

roads. Those two results conflict with the overall structure and policy of the Tort Claims Act and cause me to dissent.

Justices Pollock and Garibaldi join in this opinion.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER and STEIN—4.

*Opposed*—Justices POLLOCK, O'HERN and GARIBALDI—3.